# UNITED STATES of America, Plaintiff,

## v.

## Victor POSNER, Defendant.

## No. 82–352–CR.

United States District Court,
S.D. Florida.

Oct. 4, 1989.

See also 694 F.Supp. 881.

Neal Cartusciello, Asst. U.S. Atty., New York City, for plaintiff.

Mary Clark and Edward B. Williams (deceased), Washington, D.C., for defendant.

## MEMORANDUM OPINION

SPELLMAN, District Judge.

## ORDER APPROVING DEFENDANT'S HOMELESS PROJECT PROPOSAL

This matter came on before the Court on the Homeless Project Proposal of the Defendant, VICTOR POSNER. Upon receipt of the Proposal, the same was circulated to each member of the Advisory Committee of this Court, heretofore appointed under the chairmanship of The Honorable Dewey Knight.

Mr. Knight has reported to this Court that the Homeless Project Proposal has been considered by the various members of the Committee, and that they endorse the same and recommend its approval by this Court.

This Court feels that several aspects of the Proposal made by Mr. Posner need to be addressed by this Court in making its determination as to whether or not the Proposal should be approved and the plan implemented.

## STUDY

The first of these concerns is to what extent the plan addresses the needs of the South Florida Homelessness Studies of 1989 carried out under the auspices of Barry University, the University of Miami, Florida International University, and Florida Atlantic University.

That Study emphasized that a substantial amount of the homeless in the Southern District of Florida is composed of families, primarily mothers and children.

Many of the mothers and children deliberately became homeless to escape from the violent domestic environment in which they found themselves.

The Proposal that has been submitted by the Defendant, VICTOR POSNER, truly attempts to respond to these very needs.

Although there continues to be a dire need for assistance to other homeless groups, particularly drug and alcohol dependent homeless and the mentally ill, the Proposal clearly is directed to a clientele who indicate a willingness to enter these transitional programs and to ultimately achieve independent living. The Proposal, therefore, directs itself to that segment of the homeless in the Southern District of Florida which will achieve the most immediate solution through the involvement of both the private and public sectors, with the ultimate result of preserving the family unit once the transitional period is completed.

Most importantly, in the Court's view, is the fact that the projects sought to be funded are dedicated to assisting families and individuals without regard to race, creed or religion.

## SPECIFIC PROGRAMS FUNDED

Being satisfied that the Proposal addresses itself to one of the most important segments of the homeless population defined by the Study, the Court's next concern was the specific programs sought to be funded. Each of these programs have been studied in detail by the two outstanding members of the probation staff of this Court who were assigned to monitor this Proposal, Messrs. Frank Schwartz and Jim Lyons.

## COVENANT HOUSE FLORIDA, FT. LAUDERDALE, FLORIDA

The work of the Covenant House Florida in Broward County has been superb in providing residential shelter and support services for runaway and homeless youths under the age of 21. During the preceding fiscal year, some 2,700 individual youths have sought and obtained emergency residential shelter and support services at the Crisis Shelter. In addition, Covenant House Florida provides after care services to some 150 pregnant and/or parenting youths at the Crisis Shelter. Work is under way to relocate that shelter to downtown Fort Lauderdale, and to establish a General Population Homeless Prevention

Project. As a result of the relocation and expansion of the General Population Homeless Prevention Project, a substantial increase in support to high-risk youths who leave the Crisis Shelter or at risk of homelessness, will be achieved.

The Proposal contemplates a total allocation to Covenant House over the next two years of $300,000.

## NEW LIFE FAMILY SHELTER, MIAMI, FLORIDA

The New Life Family Shelter is a project sponsored by the Christian Community Service Agency, Inc., a United Way affiliated agency, located at 3620 N.W. 1st Avenue, in Miami, Florida. The facility is the direct result of the outstanding cooperation of the Cities of Hialeah and Miami, securing Stewart B. McKinney Homeless Assistance funds, which were used to renovate what was at one time a "crack house".

This recently opened facility is capable of accommodating fifteen families at any given time. With an average stay of six weeks, approximately 135 to 175 homeless families annually will be in this transitional program. The facility provides immediate safe, clean and comfortable shelter for displaced families; helps insure the nutritional needs of those families; and provides through the cooperation of Metro–Dade County, the necessary support services to bring about self-sufficiency. This is accomplished through a multi-agency effort of the Community Action Agency, the Federal Emergency Management Agency, through its food and shelter program, and the Metro–Dade Community Action Agency which supplies social workers. After the transitional period is completed, these families are then placed in low-income housing.

The Proposal contemplates that over the next three years, some $390,000 will be allotted to assist this program.

## THE LORD'S PLACE, PALM BEACH COUNTY AND BROWARD COUNTY

The Lord's Place presently operates three family shelters in Palm Beach County, located in West Palm Beach, Boynton Beach and Pahokee. The contemplated stay is again approximately six weeks, during which the agency guides their clients through a very regimented program intended to establish a disciplined, self-reliant spirit. Approximately 300 families per year are the recipients of this service, with approximately 92% success for the families that leave and do not again become homeless. In addition, The Lord's Place also has a van mission which provides food and clothing to those who are hungry and needy and who cannot come to one of the shelters. This program picks up donated food and clothing and distributes them throughout the County to an estimated 12,000 clients per year. They also help to administer to needy families under the United States Surplus Food Distribution approximately one million pounds of food at sixteen different locations where an additional 20,000 clients are provided for. In addition to the shelters located in Palm Beach County, two temporary shelters for homeless families are being operated and two additional permanent facilities are being established at both Boynton Beach, in Palm Beach County, and in Pompano Beach, located in Broward County.

It is contemplated that over the next three years, the Proposal will fund these programs in an amount of $360,000.

## JUNIOR LEAGUE TRANSITIONAL HOUSING PROJECT

The Junior League, in conjunction with the Health and Human Services Department of Metro–Dade County, contemplates opening their first transitional house in Dade County for battered women with children in January, 1990. The first location will be in the City of North Miami and will be able to house ten families at any one time. A second such facility is planned for South Dade County and will accommodate at least as many, if not more, than the first facility. The average period of residency is estimated by Metro–Dade's professional staff to be approximately six to nine months, actual period of time being determined by appraising the skills and situations of the residents in conjunction with the formulation of an individualized plan

for each of the women. Each of the women will be required to either work or attend school full time while a resident at the transitional house. Residents will participate daily in programs designed to build their confidence and capacity to take charge of their lives.

The Junior League is a not-for-profit Florida corporation and is working in conjunction with Metro–Dade County. The Junior League has committed the capital funds for the acquisition and renovation of the facilities contemplated with Metro–Dade committing the professional staff and operational funds for the project. A grant has been received by the League and the County from the Stewart B. McKinney Homeless Act funds in an amount of $700,-000, with matching funds coming from the Junior League in the amount of $200,000.

The Proposal contemplates the funding over the next three years of $170,000.

## TOTAL FUNDING

The total funds contemplated by the Proposal to be allocated to the various projects set forth above for the original three year commitment are in an amount of $1,220,-000. Although the amount allocated in the Proposal does not propose to expend the total amount of $3,000,000, which is currently on deposit in a tax-exempt interest-bearing account, it is the view of the Court that this is in keeping with the goals and intents of the balance of the Proposal.

It is obvious and apparent from the Study that the problems of the homeless in the Southern District of Florida are far greater and encompass a much different segment of our population than contemplated. In the past, one's perception of the homeless drew a picture of an individual whose homelessness was one of choice or was mandated by either chemical or alcohol abuse. We have come to know that this is not the case.

The conditions that exist today in the Southern District of Florida will not disappear by the infusing on a one-time basis of $3,000,000, or thrice that amount; nor will the solution to the problem of the homeless come through the actions of one good samaritan or any single governmental action. The Southern District of Florida must attack this insidious problem through the joint efforts of both the private and the public sectors. The programs that are proposed to be funded are the type of programs that must be nurtured and their numbers multiplied in order to achieve some degree of success. The collective efforts of Metropolitan Dade County, and the Cities of Hialeah and Miami, working jointly with individuals and organizations dedicated to these efforts, prove what can be achieved with proper planning and outside financial assistance.

It is the Court's view that the balance of the Proposal contemplates that through the joint efforts of government and those who are more fortunate than others, we can secure the necessary help for those less fortunate.

## A FOUNDATION FOR THE HOMELESS

The last part of the Proposal contemplates the establishment of a foundation for the homeless into which initially all uncommitted funds presently on deposit, together with the tax-exempt interest being earned on an annual basis, will be placed.

The law firm of Williams and Connolly has agreed to prepare the initial drafts for this foundation on a pro bono basis and the law firm of Holland and Knight, through its newly established pro bono division, has agreed to finalize that foundation for the Court's approval and that of the Internal Revenue Service as a charitable trust.

Although the details of that foundation are at this point solely in the embryo stage, this Court would contemplate that the board of trustees of that foundation would be broad-based and the initial selection process of those trustees would be made in great measure by recognized groups in the private sector and by governmental units, both of which are so essential and necessary if we hope to cope successfully with this problem.

It would be hoped that after the initial monies from the Posner Fund which re-

main uncommitted are transferred to the foundation, that substantial sums thereafter can be raised within the Southern District of Florida, so that on an annual basis, this foundation, through its broad-based board of trustees, will be in a position to assist worthwhile projects which exist or are starting up, to meet the future needs of the homeless.

Although the Defendant has indicated in his Proposal his dedicated intent to devote the balance of his probationary period to raising such funds for the foundation, it would be hoped that monies will be secured from both the public and private sector throughout the Southern District of Florida, and that this foundation will serve as a catalyst to be administered by those sectors in assisting them to fund and increase the number of programs similar to those being funded by this proposal.

The foundation would obviously contemplate to exist in perpetuity with the trustees themselves selecting any successor trustees to perpetuate its purpose.

## CONCLUSION

It is the conclusion of this Court, in conjunction with its committee of advisors, and the recommendations of the individuals assigned the responsibility for monitoring this Proposal, that the same embodies all of what this Court contemplated when it originally sentenced the Defendant, VICTOR POSNER, to probation. In that respect, I commend the Defendant for his efforts in the dedicated manner in which he has approached his probationary responsibility.

This Court would be remiss if it did not publicly express its sincere thanks to the unselfish dedication of its Advisory Committee. The committee consisted of: The Honorable Dewey Knight, Mr. Chesterfield Smith, Monsignor Bryan Walsh, Mr. Raul Masvidal, Mr. David Saltman, Ms. Edith G. Osman, Mr. John De Grove, Ms. Angelique Stahl, Dr. Hayward J. Benson, Jr., and Mrs. Martha Cleveland.

The particular efforts of The Honorable Dewey Knight and Chesterfield Smith, Esq., require even additional comment. Both of these individuals have dedicated their service to this Court and constantly given of their time, energy and devotion throughout these proceedings, for which this Court expresses its heartfelt thanks.

Prior to commenting on the exceptional efforts of the two outstanding Probation Officers assigned in this case, I want to express my sincere and deep appreciation to the four Universities which participated in this program, and to the professionals who were instrumental in the Study. The Universities are Barry University, University of Miami, Florida International University, and Florida Atlantic University. I want to pay particular thanks to the efforts of the individuals who were the study directors of that Study, those being the principal investigator, David F. Fike, Ph.D, ACSW, Barry University, Andrew L. Cherry, DSW, Barry University, Milan J. Dluhy, Ph.D, Florida International University, Elane M. Nuehring, Ph.D, Barry University, J. Bryan Page, Ph.D, The University of Miami, Jeffrey Schilit, Ph.D, Florida Atlantic University, and George J. Warheit, Ph.D, The University of Miami.

One individual likewise has served as a catalyst in achieving the success of this Project over the last nineteen months, since its inception. It is not a role that is uncommon to her in whatever sphere of activity she involves herself. This Court refers, of course, to Sister Jeanne O'Laughlin, President of Barry University. Her patience and the wisdom she has brought to this Project have been such that one would seriously doubt that what has been achieved could possibly have been so without her efforts. The Court deeply appreciates her service and publicly commends her for it.

Most importantly, this Court must commend in the highest possible terms the dedicated service of the United States Probation Officers, Frank Schwartz and Jim Lyons.

Although this Court would have expected no less from these individuals who are outstanding members of the United States Probation Office in the Southern District of Florida, it could not have asked more. The

efforts expended by both with regard to this matter from the first day Mr. Posner went to the Camillus House, to the Study ordered by this Court, culminating in the Proposal made to this Court by Mr. Posner, have been monumental. Literally hundreds of man hours have been devoted by them in the some year and a half that the Defendant has been on probation, with dedicated effort on their part on almost a daily basis. This Court commends them to the Chief Probation Officer, Carlos Juenke, and to the Director of the United States Probation Service in Washington, D.C., for their service to this Court and the success that service has achieved.

### ORDER

Based upon the above and foregoing, it is ORDERED AND ADJUDGED that The Victor Posner Homeless Project Proposal* be and the same is hereby approved; and Barry University be, and it is hereby directed, to fund the proposed projects in the amounts and at the appropriate time called for by said Proposal.

This Court continues to retain jurisdiction over the Defendant and the subject matter to complete the implementation of the aforesaid Proposal and the continued supervision of the Defendant during his term of probation.

DONE AND ORDERED.

### APPENDIX

**The Victor Posner**
HOMELESS PROJECT PROPOSAL

... *"reintegrating the homeless must begin with shelter."*

TABLE OF CONTENTS

Introductory Letter .............. 513
Core Programs
    Covenant House ............... 514
    New Life Family Shelter ....... 517
    The Lord's Place .............. 518
    Junior League Transitional Housing Project ................... 522
Distribution of Funds ............ 524
Establishment of a Foundation .... 525
Conclusion ..................... 526

* Said Proposal is attached hereto and made a

September 12, 1989

The Honorable Eugene P. Spellman, Judge
United States District Court
The Court's Advisory Committee on the Homeless
The Citizens of Dade,
Broward and Palm Beach Counties, Florida

The recently completed study on the homeless prepared by social scientists of the leading colleges and universities in South Florida have categorized the homeless in three major groups: individual adults, families with children and adolescents. The United States Congress, in its introduction to the Stewart B. McKinney Homeless Assistance Act indicated:

"Until recently, it was commonly perceived that the individual was homeless either by choice or because of chemical or alcohol abuse. Today, this perception does not even approach reality. Today, it is likely that the homeless individual is actively seeking employment, but cannot find it ... Today, it is far more common than before for homeless people to be women, or families with children. It is also more common that the homeless are younger, educated and possess a stable work history ... The first step our nation and the federal government must take is to dispel the stereotype of a homeless person as a middle-aged, chemically dependent male, who has, by default, found himself or voluntarily chosen to live on the street. This stereotype may or may not have been true in the past, but it is certainly demonstratably false today."

These remarks have been born out by the recently completed South Florida Homeless Study. Families with children and adolescents are the two fastest growing segments of the homeless population in the United States.

For nearly one year, I have dedicated many hours to the study of the homeless and have seen first hand numerous facilities that deal with their plight. I have part hereof as an appendix to this Order.

reviewed the extensive national studies that exist, read all of the literature currently being published and observed filmed and televised documentaries and dramatization of homeless in America. My proposal, if approved by the Court, would focus resources on the most vulnerable of the homeless population: families with children and homeless adolescents.

During testimony before the Sub–Committee on Housing and Community Development in December, 1982, a witness addressed the single most important problem facing the homeless individual or family. Dr. Louisa Stark of Phoenix, Arizona, testified:

"But the most critical aspect of homelessness is shelter. Holding a job while living in the street is an impossibility. Keeping clean while living on the street is a contradiction. Being healthy, both physically and mentally, while living on the street, is unimaginable. Any hope of reintegrating the homeless into the socioeconomic mainstream must begin with shelter."

I wholeheartedly agree with these remarks and also recognize, as did the Congress, that providing temporary shelter on an emergency basis is only the first, but most important, step in a more comprehensive attempt to meet the needs of these (homeless) Americans.

In addition to providing emergency shelter, a program of social services geared toward prevention is also necessary. Many American families and emancipated adolescents are often times a monthly rent payment away from homelessness. The research conducted in the ·South Florida Homeless Studies indicate that those individuals who are recently homeless can most readily be helped. I believe these two groups can be helped and need a program which addresses both their immediate problems of shelter and their lack of adequate life skills.

Without a reliable assurance of food, shelter and clothing, the homeless will never begin to discard their sense of hopelessness. With basic life supports in place, they can enter rehabilitation programs with a realistic expectation of long term success.

I have reached my conclusions after careful review of the Court's study results, face-to-face interactions with Program Coordinators, and on-site visits to numerous shelters in the South Florida area. I propose awarding funds to four model programs in the tri-county area. These programs most effectively utilize both the public and private sectors in offering services to their client population. They are not mere crisis oriented, one night shelters, but life transition centers offering a wide array of services to homeless families and youth who have demonstrated their desire to reclaim their independence and self worth.

Very truly yours,
/s/ Victor Posner
Victor Posner

## COVENANT HOUSE FLORIDA—HOMELESS PREVENTION PROGRAM

### Ft. Lauderdale, Florida

Covenant House Florida is a not-for-profit child care agency which provides residential shelter and support services for runaway and homeless youths under the age of 21. Covenant House Florida provides an array of services to meet the unique needs of these kids-in-crisis. In the past fiscal year (July 1, 1988—June 30, 1989), more than 2,700 individual youth sought emergency residential shelter and support services at its Crisis Shelter. Reflective of the lack of community resources, more than one-third of these youth returned to the Crisis Shelter for additional support, resulting in over 4,000 residential visits in the past fiscal year.

Covenant House Florida's experience has shown that homeless prevention services are essential to the long-term success of high risk runaway and homeless youths. Without effective prevention services that assist the youths in maintaining a stable living environment after leaving the Crisis Shelter, many of these high risk youth return to the street and ultimately find it necessary to re-access emergency resi-

dential shelter services to meet their basic needs.

To address the tremendous needs of this high risk population, Covenant House Florida seeks to establish a 2–year Homeless Prevention Program for youth who have left the crisis shelter or are at-risk of becoming homeless. Services include: home visits, individual, group, and family therapy, educational classes and workshops, health services, educational and vocational assistance, housing assistance (including referrals to Section 8 housing), community referrals, life skills classes, supportive counseling, life supports, relapse prevention, therapeutic services, Alcoholics Anonymous, Narcotics Anonymous, GED classes, and health recreational alternatives. These services are vital if these high risk youths are to have a realistic chance maintaining themselves in stable living environments.

The request for support services by these at-risk youths have grown at such a staggering rate that it has exceeded the capacity of the Crisis Shelter, both in staffing and space. Quite simply, with an average daily census of 132 residential clients in the 104–bed facility, they are unable to provide the necessary prevention services to needy clients as part of their current program.

The expansion of prevention services is vital in helping these at-risk youth maintain stable living environments. Experience has shown that the provision of support services fosters independence and the ability to sustain housing. For example, of the 150 pregnant or parenting adolescents who received support services through the Mom/Baby Aftercare Services Project in 1988, only 16% returned to the Crisis Shelter for a second residential stay. Conversely, the high risk youths who receive limited preventative aftercare services had a repeat residential stay of 48% during the same period. Clearly, the population that received support services required significantly fewer residential visits to the Crisis Shelter.

An additional factor regarding homeless prevention services involves project location. Although Covenant House Florida's beach location of the Crisis Shelter is highly desirable to access the multitudes of homeless high risk youths who frequent the Strip, it is not particularly accessible to youth once they leave the Crisis Shelter and move to a more central area, away from the ever-present temptations of the beach.

Covenant House Florida has located and leased 5,252 square feet of space at 300 N.E. 3rd Avenue, Suite 311, Ft. Lauderdale, Florida 33301. This downtown location of the Homeless Prevention Program on the major bus route is much more accessible to this population. The Project will provide homeless prevention services to high risk youth under 21, Monday through Friday, from 9:00 a.m. to 8:00 p.m., and Saturday from 9:00 a.m. to 5:00 p.m.

## MOM/BABY HOMELESS PREVENTION SERVICES

Currently, Covenant House Florida provides aftercare services to 150 pregnant and/or parenting youth at the Crisis Shelter. Mom/Baby aftercare services are comprised of two program components: the Broward County Juvenile Services Board (under 18–year-old pregnant and/or parenting youth) and the U.S. Office of Adolescent Pregnancy Prevention (18 to 20–year–old pregnant and/or parenting youth). Participants in this program receive the following aftercare services: home visits, individual, group, and family therapy; educational classes and workshops; support groups; health services; educational and vocational assistance; community referrals; and recreational activities. This program is designed with the goal of maintaining the pregnant and/or parenting youth in a stable, healthy living environment.

Notably, funding for the Office of Adolescent Pregnancy Prevention Mom/Baby Project ends September 30, 1989. Without alternative funding, this successful program will be forced to limit or end services to new clients.

The relocation and expansion of Mom/Baby Aftercare Program will provide increased support to a greater number of pregnant and/or parenting adolescents. Participation in group activities will increase as a result of the participant's decrease in travel time. Fewer participants will return to the Crisis Shelter for emergency residential shelter as a result of increased homeless prevention support services.

GENERAL POPULATION HOMELESS PREVENTION SERVICES

The goal of the General Population Homeless Prevention Project is to provide support services to needy youth who require assistance in maintaining a stable living environment, thereby decreasing the likelihood of a return to the Crisis Shelter for additional residential support. This expansion of services will be modeled after the very successful Mom/Baby Aftercare Program.

Homeless Prevention Services to the general population of Covenant House Florida currently are limited in scope due to staffing and space constraints. With over 1,200 youths completing the program each year, the need far outweighs the availability of services. Youth leaving the Crisis Shelter need the added support of formal, consist-

ent, easily accessible preventative aftercare services, including supportive counseling, life supports, therapeutic services, Alcoholics Anonymous and Narcotics Anonymous, etc., if they are to have a realistic chance of maintaining themselves in an independent living situation.

As a result of the relocation and expansion of the General Population Prevention Project, a substantial increase in support to high risk youth who leave the Crisis Shelter or at-risk of homelessness will be achieved. With the provision of these services, it is expected that the recidivism rate for the general population will decrease significantly.

At Covenant House Florida, high risk runaway and homeless youths come voluntarily, off the street, seeking to change, seeking to move away from prostitution and pornography, away from drugs, away from stealing, and away from the dead-end lifestyle of the streets. The Homeless Prevention Program gives these high risk youths a chance to rebuild their shattered existences and to become positive contributing citizens. Without timely intervention as would be afforded them under this project, these formerly homeless street children of today are destined to become the chronic homeless population of tomorrow.

COVENANT HOUSE FLORIDA—HOMELESS PREVENTION BUDGET NARRATIVE

| | FIRST YEAR | SECOND YEAR | TOTAL TWO YEARS |
|---|---|---|---|
| ADMINISTRATIVE COSTS | | | |
| 50% of a Director & Secretary Salaries & Benefits | $ 35,300 | $ 35,300 | $ 70,600 |
| DIRECT PROJECT COSTS | | | |
| Salaries for a Coordinator, 4 Case Managers | 92,000 | 97,500 | 189,500 |
| Payroll Taxes @ .0972 | 8,950 | 9,500 | 18,450 |
| Employee Benefits @ .142 | 13,000 | 13,800 | 26,800 |
| Total Personnel Costs | $113,950 | $120,800 | $234,750 |
| Specific Assistance (Food, Clothing, Activities, etc.) | $ 15,900 | $ 16,700 | $ 32,600 |
| Travel (Bus Passes, Van) | 14,800 | 15,500 | 30,300 |
| Professional Services (Therapists) | 20,800 | 21,800 | 42,600 |
| Supplies (Office, Printing) | 8,000 | 8,400 | 16,400 |

| | FIRST YEAR | SECOND YEAR | TOTAL TWO YEARS |
|---|---|---|---|
| Occupancy (Utilities, Telephone, Rent, Janitorial) | $41,500 | $43,500 | $85,000 |
| Total Other Than Personnel Costs | $101,000 | $105,900 | $206,900 |
| Total Direct Costs | $214,950 | $226,700 | $441,650 |
| Total Administration Costs | 35,300 | 35,300 | 70,600 |
| TOTAL COSTS | $250,250 | $262,000 | $512,250 |
| FUNDS FROM POSNER GRANT | $150,000 | $150,000 | $300,000 |
| FUNDS TO BE RAISED BY COVENANT HOUSE | $100,250 | $112,000 | $212,250 |

## NEW LIFE FAMILY SHELTER

### Miami, Florida

Christian Community Service Agency, Inc. (CCSA) is a United Way affiliate agency, a private, non-profit, community-based organization incorporated in the State of Florida in 1965. Sponsored by the Protestant community to provide services for indigent and disadvantaged people of all backgrounds and faith, CCSA has a 23–year history of providing emergency assistance, case work, employment, and community organizing services designed to help individuals and families become self-sufficient. The New Life Family Shelter, located at 3620 NW 1 Avenue, Miami, Florida, was recently opened to accommodate up to 15 families at any given time. Based on an average stay of six weeks, approximately 135—175 homeless families could be housed each year. The shelter provides social service programs through Metro–Dade County to help homeless families facing a relocation crisis, due to a variety of social and economic stresses. The shelter is designed to empower families to help themselves, and regain a sense of dignity, resourcefulness, and independence. Specific goals of the family shelter are:

1) To provide displaced families with immediate, safe, clean and comfortable shelter.

2) To help ensure the nutritional needs of resident families are adequately met.

3) To provide the supportive services necessary to bring about the self-sufficiency of these families, including:

a) assisting resident families in obtaining adequate employment

b) assisting resident families in budgeting family resources

c) promoting resident family health

d) assisting resident families with childcare

e) assisting resident families in education and self-reliance

f) assisting resident families in securing and moving into a new home.

A multi-agency effort has been established to accomplish this and to provide the services indicated above. As other specialized needs are identified, appropriate community service providers are accessed to provide those services on site on an in-kind basis. For instance, transportation allowances are made available through the Community Action Agency and when available through the Federal Emergency Management Agency (FEMA) Food and Shelter Program. This enables homeless families to get to the shelter and to appropriate agencies to seek employment. At the present time, the Metro–Dade Community Action Agency is supplying social workers to the New Life Family Shelter through monies from the Stewart B. McKinney Homeless Assistance Act.[1]

The New Life Family Shelter recently opened after completion of a renovation project which turned an abandoned motel

---

1. Stewart B. McKinney Homeless Assistance Act, Public Law 100–77, June 1987. The Act was established to provide urgently needed assistance to protect and improve the lives and safety of the homeless, with special emphasis on families and children.

and crack house into Miami's first transitional shelter for homeless families. Both the City of Miami and Hialeah committed funds to the renovation of the facility.

## NEW LIFE FAMILY SHELTER
## BUDGET NARRATIVE

| REVENUES | 7/1/89 – 6/30/90 | 7/1/90 – 6/30/91 | 7/1/91 – 6/30/92 |
|---|---|---|---|
| Local Government | $102,000 | | |
| United Way of Dade County | 77,380 | $ 80,475 | $ 80,475 |
| State of Florida | 64,066 | 64,066 | 64,066 |
| United Protestant Appeal | * | 35,000 | 36,400 |
| Church–Related Donations | 34,500 | 50,199 | 52,281 |
| Federal Emergency Management Agency | 16,500 | | |
| Resident Rent (10% of Monthly Income) Projected | 5,300 | 5,300 | 5,300 |
| **Total Revenues | $299,746 | $235,040 | $238,522 |

*Raised over $100,000 during fiscal year toward shelter start up costs.
**Does not include in-kind services contributed by other agencies.

| EXPENSES | | | |
|---|---|---|---|
| Food | $109,500 | $109,500 | $113,880 |
| Staff Salaries & Benefits | 88,675 | 92,003 | 95,675 |
| Support Services & Benefits | 66,955 | 68,453 | 70,866 |
| Administrative Costs | 55,374 | 56,842 | 59,065 |
| Utilities/Telephone | 28,800 | 28,800 | 28,992 |
| Shelter Expenses (Rent, Custodial Supplies, Maint.) | 28,300 | 29,300 | 14,432 |
| Supplies | 8,100 | 6,100 | 6,280 |
| Insurance | 7,257 | 7,257 | 7,547 |
| Furnishings/Equipment Replacement | 7,000 | 7,000 | 7,000 |
| Miscellaneous | 5,900 | 5,900 | 5,900 |
| Client Transport | 2,260 | 2,260 | 2,260 |
| Professional Fees | 1,300 | 1,300 | 1,300 |
| Total Expenses | $409,421 | $414,715 | $413,197 |
| Funds Alloted from Posner Fund | $100,000 | $140,000 | $150,000 |
| Total Funds Needed Over 3 Years | $390,000 | | |

## THE LORD'S PLACE
### Ft. Lauderdale/West Palm Beach, Florida

In Palm Beach County are three family shelters operated by the Lord's Place, a ministry to the poor, starting its tenth year of operation. The shelters in West Palm Beach, Boynton Beach, and Pahokee are open only to families in need of assistance and have at least one parent who is willing to accept immediate full-time employment. Families are allowed to stay at the shelter free for six weeks (a little longer, if necessary) but must agree to save 75% of their income to put toward initial apartment expenses that they will incur at the conclusion of their stay.

During the six-week period, the Lord's Place guides their clients through a very regimented program intended to establish a disciplined, self-reliant spirit. Rules are fixed and enforced and a respect for order, property and authority is introduced. The rules include: no visitors, parties, or socialization among families; no weapons, alcohol, or drugs; no excessive noise; lights out by 10:00 p.m. The Lord's Place uses a series of rules and procedures to skillfully move a family toward rehabilitation. For example, the shelter apartments use ceiling fans, rather than air conditioning, to teach the families economy in electrical usage. Families are required to acquire all their food through a shopping list that is given to the Lord's Place grocery, so that their purchasing and nutritional habits can be formulated and monitored.

The Lord's Place rehabilitates approximately 300 families per year. Ninety-two percent of the families leave and do not again become homeless.

The Lord's Place also has a van mission which services St. Julian Church, Holy Name Church, Grace Episcopal of West Palm Beach, St. Paul of the Cross, North Palm Beach, and El Centro, Indiantown. The van mission provides food and clothing to those who are hungry and needy, and who cannot come to one of the shelters. This program picks up donated food and clothing and distributes them throughout the county. The estimate of clients served annually is 12,000.

Another program administered by the Lord's Place is the U.S. Surplus Food Distribution in Lantana, Florida. Needy families that meet the poverty levels, as reported in their Declaration of Income, or who receive Aid to Families with Dependent Children, Supplementary Security Income, Food Stamps or Medicaid are eligible to receive the food. This program has distributed over 1 million pounds of food at 16 different locations throughout Palm Beach County. It is estimated that 20,000 clients are served by this program annually, at a cost of approximately $80,000.

Another center was recently dedicated in Pahokee, Florida, which will serve 100 migrant children of low income families in the Indiantown area.

In addition to its present three shelters, the Lord's Place operates two temporary shelters for homeless families and is developing two more permanent facilities for homeless families, one adjacent to its Boynton Beach shelter at 1750 N.E. 4 Street, and another in Broward County's Pompano Beach.

### THE LORD'S PLACE, INC. CAPITAL BUDGET YEAR ENDING JUNE 30, 1990

|  | PALM BEACH OPERATING FUND | BROWARD OPERATING FUND |
|---|---|---|
| Purchase of Broward County Shelter Facility |  |  |
| Total estimated cost of acquisition |  | $565,000 |
| Less financing (mortgages assumed on transaction) |  | 135,000 |
| Net cash at closing |  | 430,000 |
| Estimated renovation and conversion costs |  | 25,000 |
| Mortgage payments—10 months @ approx $5,000 |  | 50,000 |
| Total capital outlay budgeted for Broward |  | $505,000 |
| Boynton Beach Shelter No. 2 |  |  |
| Total estimated cost of construction, including furniture, appliances and furnishings | $520,000 |  |
| Replacement of can/truck | 10,000 |  |
| Riding mower, ladder, maintenance equipment | 4,000 |  |
| Furnishing replacements | 3,000 |  |
| Total capital outlay budgeted for Boynton/WPB | $537,000 |  |
| Grand total – Capital Budget – | $1,042,000 |  |

## SUPPORT AND REVENUE

| | OPERATION FUND | BROWARD FUND | SURPLUS FOOD FUND | TOTAL ALL FUNDS |
|---|---|---|---|---|
| **Contributions:** | | | | |
| Contributions | $131,601 | $127,996 | $ | $259,597 |
| PB Ladies Auxiliary Fundraiser | 72,000 | | | 72,000 |
| United Way Campaign | 13,000 | | | 13,000 |
| Lord's Place Contributions | | | 79,000 | 79,000 |
| Total Contributions | $216,601 | $127,996 | $ 79,000 | $423,597 |
| Interest Income | $ 58,119 | | | $ 58,119 |
| Thrift Shop (Thru 12/31/89) | $ 33,025 | | | $ 33,025 |
| **Public Support:** | | | | |
| Federal: | | | | |
| FEMA Grants | $ 54,259 | | | $ 54,259 |
| Surplus Food Program (USDA) | | | $ 76,094 | $ 76,094 |
| Total Federal | $ 54,259 | | $ 76,094 | $130,353 |
| Palm Beach County: | | | | |
| Shelter Units—Repairs | 6,500 | | | 6,500 |
| Shelter Units—Payroll | 108,000 | | | 108,000 |
| Food Program Subsidy Women's Shelter | | | | |
| Total Palm Beach County | $114,500 | | | $114,500 |
| Municipalities: | | | | |
| City of Boynton Beach | | | | |
| City of West Palm Beach | $ 2,500 | | | $ 2,500 |
| Total Municipalities | $ 2,500 | | | $ 2,500 |
| Other | | | | |
| Total Public Support | $171,259 | | $ 76,094 | $247,353 |
| Total Support and Revenue | **$479,004** | **$127,996** | **$155,094** | **$762,094** |

## EXPENSES

| | OPERATING FUND | BROWARD FUND | SURPLUS FUND | PLANT FUND | TOTAL ALL FUNDS |
|---|---|---|---|---|---|
| **Program Services:** | | | | | |
| Family Shelters: | | | | | |
| Salaries | $ 94,125 | $ 32,601 | | | $126,726 |
| Payroll Taxes | 7,559 | 2,667 | | | 10,226 |
| Utilities | 19,589 | 6,900 | | | 26,489 |
| Insurance | 4,800 | 4,000 | | | 8,800 |
| Repairs & Maintenance | 9,529 | 2,150 | | | 11,679 |

| | OPERATING FUND | BROWARD FUND | SURPLUS FUND | PLANT FUND | TOTAL ALL FUNDS |
|---|---|---|---|---|---|
| Transportation Equipment | $2,000 | $1,500 | | | $3,500 |
| Food & Related Supplies | 5,620 | 2,268 | | | 7,888 |
| Depreciation | | | | $55,228 | 55,228 |
| Other | 300 | 225 | | | 525 |
| Subtotal | 143,522 | 52,311 | | 55,228 | 251,061 |
| **Emergency Lodging:** | | | | | |
| Other Temp. Lodging Charges | 61,568 | 5,381 | | | 66,949 |
| Total Family Shelter | 205,090 | 57,692 | | 55,228 | 318,010 |
| **Thrift Shop** | | | | | |
| Salaries | 23,617 | | | | 23,617 |
| Payroll Taxes | 2,004 | | | | 2,004 |
| Rent | 3,600 | | | | 3,600 |
| Other | 400 | | | | 400 |
| Total Thrift Shop | 29,621 | | | | 29,621 |
| **Surplus Food:** | | | | | |
| Salaries | | | $ 66,610 | | $ 66,610 |
| Payroll Taxes | | | 5,338 | | 5,338 |
| Warehouse Rental | | | 42,600 | | 42,600 |
| Truck Rental | | | 32,600 | | 32,600 |
| Utilities | | | 2,573 | | 2,573 |
| Subsidy to Surplus Food | 79,000 | | | | 79,000 |
| Other | 10,100 | | 2,544 | | 12,644 |
| Total Surplus Food | 89,100 | | $152,265 | | 241,365 |
| **Visitation and Outreach:** | | | | | |
| Transportation Equipment | 7,784 | 2,000 | | | 9,784 |
| Depreciation | | | | 12,322 | 12,322 |
| Insurance | 6,193 | 4,645 | | | 10,838 |
| Total Visitation & Outreach | 13,977 | 6,645 | | 12,322 | 32,944 |
| Total Program Services | $337,788 | $64,337 | $152,265 | $67,550 | $621,940 |

EXPENSES

| | OPERATING FUND | BROWARD FUND | SURPLUS FUND | PLANT FUND | TOTAL ALL FUNDS |
|---|---|---|---|---|---|
| **Supporting Services:** | | | | | |
| General and Administrative: | | | | | |
| Salaries | $ 21,500 | | | | $ 21,500 |
| Payroll Taxes | 1,670 | | | | 1,670 |
| Office Expense | 12,240 | $ 9,180 | | | 21,420 |
| Interest Expense | | 36,759 | | | 36,759 |
| Professional Fees | 13,100 | 7,875 | $ 1,000 | | 21,975 |

| | OPERATING FUND | BROWARD FUND | SURPLUS FUND | PLANT FUND | TOTAL ALL FUNDS |
|---|---|---|---|---|---|
| Insurance | $23,144 | $8,592 | $1,829 | | $33,565 |
| Other | 1,412 | 803 | | | 2,215 |
| Total General & Administrative | $ 73,066 | $ 63,209 | 2,829 | | 139,104 |
| Fundraising: | | | | | |
| Salaries | | | | | |
| Payroll Taxes | | | | | |
| Postage & Printing | 600 | 450 | | | 1,050 |
| Total Fundraising | 600 | 450 | | | 1,050 |
| Total Supporting Services | 73,666 | 63,659 | 2,829 | | 140,154 |
| Total Expenses | $411,454 | $127,996 | $155,094 | $67,550 | $762,094 |

If we were to receive assistance in connection with operations instead of capital funds, we would request assistance in the range of $250,000 to $350,000 annually for the next three years.

---

## JUNIOR LEAGUE TRANSITIONAL HOUSING PROJECT

### Miami, Florida

The Junior League, in conjunction with the Health and Human Services Department of Metro–Dade County, will open the first transitional house in Dade County for battered women with children in January, 1990.

1. Population served. The clients of the Junior League Transitional House will be women with children who have been the victims of domestic violence who demonstrate the potential and determination to remove permanently themselves and their children from the abusive environment and achieve independent living. Clients will be screened from those who have successfully completed the Safespace Program within the Advocates for Victims Program operated by Metro–Dade. In special circumstances, women who otherwise meet the eligibility requirements for the Transitional House but who have not completed the Safespace Program will be considered.

2. Number of people served. The first Transitional House which will open in January, 1990, is located in the City of North Miami and will house ten (10) families. There are eight (8) two-bedroom apartments and two (2) one-bedroom apartments in the apartment building. The two-bedroom apartments can accommodate a mother and up to five children. The one-bedroom apartments can accommodate a mother and up to three children, if necessary. A second Transitional House is planned for South Dade County and will accommodate at least as many if not more women and children.

3. Length of residency. The maximum length of residency in the Transitional House is twenty-four (24) months, depending upon the particular needs of the family. However, examination of the target population by the Metro–Dade professional staff suggests that the average period of residency will be six to nine months. The period of residency for each resident will be determined by the professional staff after appraising the skills and situation of the resident and in conjunction with the formulation of an individualized plan for each woman. Each woman will be required to either work or attend school full-time while a resident of the Transitional House.

The staff will meet twice weekly with each resident, serving as resource persons and counselors in support of each woman meeting her goals. Residents will participate daily in programs designed to build their confidence and capacity to take charge of their life. They will be trained to

develop problem-solving strategies for dealing with crises at home and work in a more constructive way. An initial psychological assessment will be done on each adult or child as necessary. With the resident's input, the social worker will develop an action plan directing realistic goals and progress within one week of admission.

4. Funding of the Transitional House. The Junior League, a not-for-profit Florida corporation, in partnership with Metro–Dade County is creating the first Transitional House in Dade County. The Junior League is committing the capital funds for the acquisition and renovation of the apartment building. Metro–Dade is committing the professional staff and operational funds to the project. The Junior League and Metro–Dade received $700,000 from a Stewart B. McKinney Homeless Grant toward the acquisition/renovation and operation of the first Transitional House for the initial five years. Approximately an additional $150,000 must be raised to pay for the acquisition/renovation costs of the first Transitional House. However, in order to apply for another Stewart B. McKinney Grant, the Junior League must have $200,-000 in matching funds.

JUNIOR LEAGUE TRANSITIONAL
HOUSING PROJECT BUDGET
NARRATIVE

OPERATIONAL BUDGET

The operating expenses will be provided through cooperative efforts of the Junior League of Miami and the Metro–Dade Government as follows:

A. Expense Responsibility of Metro–Dade Government — Annual Cost

1. Administration

The project will be administered by Metro–Dade with existing personnel expanding their current responsibilities:

| | Annual Cost |
|---|---|
| Executive Director, Advocates for Victims (estimated 5% of time) | –0– |
| Director, Safespace (estimated 10% of time) | –0– |
| Safespace Coordinator (estimated 10% of time) | –0– |
| Psychologist (as needed for client assessment and plans) | –0– |

2. Full-time Staff

| | |
|---|---|
| Residential Manager | $ 25,277 |
| Social Worker (Level I) plus one Social Worker Aide | 49,768 |
| Professional Liability Insurance | 4,500 |

3. Maintenance

| | |
|---|---|
| Custodian Services | 12,000 |
| Telephone ($18/mo × 12 mos. × 15 units) | 4,050 |
| Electricity ($125/mo/unit × 15 units) | 22,500 |
| Water/Waste ($50/mo/unit × 12 mo × 15 units) | 9,000 |
| Program Liability Insurance (Metro–Dade is self-insured and will assume liability) | –0– |
| Total Expense to Metro–Dade | $127,095 |

OFFSETTING METRO–DADE INCOME:

Metro–Dade government (Advocates for Victims Programs) receives funding from many sources, including VOCA Funds; Federal Grants through the Family Violence Protection Act; proceeds from the State of Florida Marriage License Trust Fund (Earmarked for Domestic Violence Shelter and administered through HRS) and Private Donations. In addition, 30% of the collected rent for the project will be paid by the Junior League of Miami to offset a portion of the operating expenses.

B.  Expense Responsibility of the Junior League of Miami

|  |  | Annual Cost |
|---|---|---|
| 1. | Major Building Repairs | $13,347 |
| 2. | Telephone, Electric, Water, Waste | 6,480 |
| 3. | Property Insurance | 2,000 |
|  | Total Expense to Junior League | $21,827 |

OFFSETTING JUNIOR LEAGUE OF MIAMI INCOME:

The Junior League of Miami will retain 70% of the collected rent to offset a portion of the operating expenses. Rent is determined on a sliding scale based on disposable income up to $300/month. It is estimated the annual gross collected rent is as follows:

10 units at an average $120/month = $14,400

CAPITAL BUDGET

A.  Funding sources as of April 1989 are as follows:

| | |
|---|---|
| Junior League of Miami '88–'89 | $100,000.00 |
| Junior League of Miami '89–'90 | 40,000.00 |
| The Knight Foundation | 50,000.00 |
| Del Monte Foods | 3,000.00 |
| Bacardi Corporation | 1,000.00 |
| Total Committed Funds | $194,000.00 |

B.  Acquisition and Renovation Costs:

| | |
|---|---|
| Cost of Building | $301,000.00 |
| Renovation Costs | 120,000.00 |
| Total Required Capital Funding for Project | $421,000.00 |

C.  HUD Grant

Dade County and the Junior League have made a joint application for a grant from the Stewart B. McKinney Homeless Act Funds. The Junior League has applied for $200,000.00 for acquisition and Dade County has requested $125,000.00 per year for operating funds. Money will be awarded June 30.

The Junior League is requesting $200,000.00 to be applied as matching funds for the Stewart B. McKinney Homeless Fund.

## DISTRIBUTION OF FUNDS

The following is the proposed initial outlay of funds to the programs previously outlined in this text. Funds will be disbursed over a three (3) year period, except for Covenant which will be funded for two (2) years. These grant funds were made after careful analysis and review of the specific requests made by each program as to their anticipated need.

|  | 1990 | 1991 | 1992 |
|---|---|---|---|
| The Lord's Place<br>West Palm Beach, FL | $ 80,000 | $ 80,000 | $ 80,000 |
| Covenant House<br>Ft. Lauderdale, FL | 150,000 | 150,000 |  |
| The Lord's Place<br>Ft. Lauderdale, FL | 40,000 | 40,000 | 40,000 |
| New Life Family Shelter<br>Miami, FL | 100,000 | 140,000 | 150,000 |
| Junior League Transitional<br>  Housing Project<br>Miami, FL | 50,000 | 60,000 | 60,000 |
|  | $420,000 | $470,000 | $330,000 |
| Total 3-Year Commitment |  | $1,220,000 |  |

## ESTABLISHMENT OF A FOUNDATION

Having thoroughly considered the groups for which these funds could create the greatest long-term value, I have also thoroughly determined that $3 million is not a great amount of money to spend on a problem so massive. Accordingly, my recommendation is to create a foundation for the homeless, utilizing the $3 million. The initial disbursement of funds would be released from the present set-aside of $3 million as if it were a quasi-endowment.

After the initial funding commitments are completed, a foundation would be formed within one year for the purpose of generating additional funds annually to support homeless projects from the three counties: Dade, Broward, and Palm Beach. It is recommended that the law firm of Williams and Connolly donate its time and expertise in establishing this foundation. It is further recommended that in the future, additional time and services be donated by other local Dade County law firms. As a part of its mission, these legal consultants will help establish the format for the disbursement of interest accrued in the future from the funds. The exact percentage to be disbursed to each of the three counties would be based on the populations of the counties, as well as the quality of new proposals submitted.

It will be determined what type of Board of Trustees would be formed to manage the money, as well as the best manner of disbursing funds to the three counties. For the foundation to be a true success, it should attract talented directors to guide these activities and monitor its funding.

To raise additional capital for the foundation, I will endeavor to expand the "Royal Crown Really Cares" concept, which I initiated in April, 1988, and which has already met with considerable success. It is also my desire to tap every available resource to create an ongoing source of funds for these core projects and future worthy programs for the homeless. I believe that such efforts can greatly multiply the foundation's funds for the homeless to an amount greater than the $3 million envisioned by the Court.

**526**

## CONCLUSION

As previously explained, the foundation for the homeless expects to develop additional sources of capital to greatly multiply the money available for programs dealing with the homeless in the South Florida area. The core programs can expect to receive a share of additional income earned by the foundation, along with other programs and beneficiaries that will be added as the fund continues to grow.

It is important to realize that I have not focused on the simple expenditure of $3 million, for that sum is insignificant in comparison to the need. Rather, I have chosen to allocate the initial outlay of capital to several core programs, discussed previously in this report, as a catalyst for launching a major effort to generate a truly significant endowment that will have a lasting and significant impact on the South Florida homeless. It is my hope that the funding of these programs will serve as a model for other communities outside the South Florida area, and send a message that the Government working with the private sector can form an effective partnership to stem this evergrowing crisis plaguing America. When the need is great, the deed must be great.

Respectfully submitted,
/s/ Victor Posner
Victor Posner